

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORY TANNER,                              )
                                          )
        Plaintiff,                        )
                                          )    No. 10 C 1645
        v.                                )
                                          )    Judge Gary Feinerman
CITY OF WAUKEGAN,                         )
OFFICER MURAUSKAS, LIEUTENANT             )    Magistrate Judge Arlander
FLORIP, and DETECTIVE FARMER,             )    Keys
                                          )
        Defendants.                       )

## MEMORANDUM OPINION AND ORDER

On March 29, 2008, Plaintiff Cory Tanner ("Mr. Tanner") was
arrested in Waukegan, Illinois, treated for injuries that
allegedly occurred as a result of the arrest, and was confined in
the Waukegan jail from that date until March 31, 2008.  Almost
two years later on March 12, 2010, he filed this action against
the City of Waukegan ("the City") and three of its employees,
Officer Murauskas, Lieutenant Florip, and Detective Farmer ("the
individual defendants").  As described more fully below, Mr.
Tanner brings this action pursuant to 42 U.S.C. § 1983, alleging
that all the defendants violated several of his constitutional
rights. Mr. Tanner also seeks indemnification from the City for
any award of damages he may obtain against the individual
defendants pursuant to 745 ILCS 10/9-102.  Currently before the
Court is the City's motion to bifurcate the § 1983 claim against
it and to stay discovery on that claim until all other claims
against the individuals have been resolved.  For the reasons

explained below, the motion is granted.

## Factual Background

Mr. Tanner alleges that on March 29, 2008, he was arrested for no apparent reason while walking down a street in the City. According to his complaint, Officer Murauskas and Lieutenant Florip repeatedly struck him in the body and face during the arrest, causing serious bodily injury and fracturing his arm. (Compl. at ¶¶ 7, 10.) Mr. Tanner claims that, despite his pleas for medical attention, Officers Murauskas and Florip insisted on transporting him to the Waukegan police station instead of a hospital and then later destroyed a video recording of his arrest. (*Id.* at ¶¶ 11-13.) Mr. Tanner was eventually taken to the hospital to be treated for his injuries, but after returning to the Waukegan jail, he was forced to stay there for the next two days and was prevented from posting a personal recognizance bond. (*Id.* at ¶ 16.) Mr. Tanner claims that he was released on March 31 and that, after he returned to the police station two days later to file a complaint regarding his treatment, the defendants retaliated by changing the misdemeanor count against him to a felonious count of aggravated battery. (*Id.* at ¶ 22.)

## Discussion

Federal Rule of Civil Procedure 42(b) states, in relevant part, that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or

2

more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). As Rule 42(b)'s language suggests, courts have broad discretion in deciding whether to bifurcate issues presented in a case and to try them separately. *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000). Certain conditions, however, must be met in order to support a motion to bifurcate. A court must determine if separate trials would avoid prejudice to a party or serve the purpose of judicial economy, though only one of these criteria need be met. *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999); *MCI Communications v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1166 (7th Cir. 1983). This standard also applies when, as here, a plaintiff brings a § 1983 claim against a municipality pursuant to *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See Treece v. Hochstetler*, 213 F.3d 360, 364-65 (7th Cir. 2000); *Medina v. City of Chicago*, 100 F. Supp.2d 893, 894 (N.D. Ill. 2000) ("There is no question that a district court has the discretion to sever a *Monell* claim against a municipality from claims against individual police officers and stay litigation of the *Monell* claim until the rest of the case is resolved.") (internal quote and citation omitted).

### I. The Nature of the Claims

As an initial matter, Mr. Tanner's complaint is not entirely

clear on which of the § 1983 claims are asserted against the City and which are brought only against the individual defendants. On its face, the complaint includes only one count against the City by alleging in Count IV that all the defendants caused him to be confined in the Waukegan jail for an unlawful period of time. The remaining § 1983 claims – excessive force (Count I), failure to intervene (Count II), failure to provide medical care (Count III), retaliation (Count V), destruction of evidence (Count VI), and conspiracy (Count VII) – name the individual defendants but not the City itself.

Nevertheless, these counts all ask for judgments against the City as well as the individuals, and they all allege that the individual defendants' violation of Mr. Tanner's rights resulted, in part, from the City's policies and practices. Indeed, each count brought against the individual defendants includes a detailed, five-point list of the City's policies that allegedly gave rise to the police officers' conduct. Claims involving a city's policies are properly asserted against the municipality itself, not its non-supervisory employees. As it is well established that a municipality cannot be liable under § 1983 based on the doctrine of *respondeat superior*, *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003), the Court construes all of Mr. Tanner's § 1983 claims to include claims against the City pursuant to *Monell v. Dep't of Social Servs. of City of New*

*York*, 436 U.S. 658, 690 98 S.Ct. 2018, 2035-36 56 L.Ed.2d 611 (1978) (authorizing claims for constitutional harms resulting from a municipality's customs and policies).

The complaint also fails to state whether the individual defendants are sued in their official or individual capacities, a situation under which courts sometimes presume that an official capacity claim has been asserted. *See Smith v. Doherty*, 767 F. Supp. 925, 927 (N.D. Ill. 1991). For the purposes of this motion, however, the Court assumes that the officers have been sued in their individual capacities because a contrary finding would render opposition to the bifurcation motion moot. *See Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) (finding that a suit naming a city official in his official capacity constitutes a suit against the city itself). Moreover, the complaint seeks punitive damages from the individual defendants, and such requests suggest an intent to sue the officers in their individual capacities. *Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001).

## II. The Liability Issues

The City argues that the *Monell* claims against it should be bifurcated from claims against the individual defendants because Mr. Tanner cannot proceed with his *Monell* claims without first showing that the individual defendants have violated his constitutional rights. (Def's. Mot. at 4-5.) Relying on *City of*

5

*Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), the City contends that bifurcation is warranted because if Mr. Tanner fails to show that he suffered a constitutional harm by the individuals' actions, his *Monell* claims against the City will necessarily fail. (*Id.*) Mr. Tanner responds that his *Monell* claims are independent of any showing of liability against the individual defendants under the Seventh Circuit's decision in *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2010), and that bifurcation is therefore not appropriate in this case.

In *Thomas*, the Seventh Circuit addressed whether *Heller* established a firm rule requiring a plaintiff to show individual officer liability under § 1983 before a *Monell* claim could succeed. *Heller* had determined that, where a plaintiff sues a municipality based on the actions of one of its employees, the plaintiff cannot prevail on the *Monell* claim without first showing that an individual defendant violated his constitutional rights. *See Heller*, 475 U.S. at 799, 106 S.Ct. at 1573. The Court did not state that a defendant must be liable for such a harm. *See id.* *Thomas* concluded that *Heller* does not mean that a plaintiff can never succeed on a *Monell* claim against a municipality without first showing that an officer is liable to him for violating his rights under § 1983. *Thomas*, 604 F.3d at 305. As the Seventh Circuit noted, no affirmative defense had

6

been presented to the jury by the individual officers in *Heller*. *Id.* at 304-05. Had they asserted a defense such as qualified immunity, it would have been possible for a jury to conclude (1) that the defendants had violated the plaintiff's rights, but (2) that they were not liable for that violation based on the asserted defense. *Id.* at 304. "In that case," the Seventh Circuit concluded, "one can still argue that the City's policies caused the harm, even if the officer was not individually culpable." *Id.*

Accordingly, the Seventh Circuit set forth three factors to consider in determining whether a municipality's liability depends on the actions of its officers: (1) the nature of the constitutional violation that the plaintiff alleges; (2) the theory of municipal liability that supports the *Monell* claim; and, (3) the defenses that the individual defendants have asserted. *Id.* at 305. *Thomas* held that, by using these factors, courts can determine whether the facts presented in a case comply with *Heller*'s actual rule: "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Id.*

The parties do not clearly distinguish between the first two *Thomas* factors, but Mr. Tanner appears to argue that he satisfies the first element based on an overlap between evidence relevant both to his *Monell* claims and to the defenses the individual

defendants may be able to assert. *Thomas* involved allegations that various municipal employees were deliberately indifferent to the serious medical needs of the plaintiff in that case, and the Seventh Circuit noted that the individual defendants could have argued that they did not act with a culpable intent because the municipality's practices prevented them from responding to the plaintiff's needs in an appropriate manner. *Thomas*, 604 F.3d at 293.

Likewise, Mr. Tanner contends, the individual defendants here could be found not to have been indifferent to his constitutional rights because the City's policy of failing to provide adequate oversight, as well as its deficient training procedures, prevented the defendants from (1) addressing his medical needs and (2) releasing him from jail within a proper time frame. (Resp. at 5.) A jury, therefore, could find that the officers did not act with deliberate indifference to his rights because the City's policies made it impossible for them to act in a constitutionally appropriate manner.

This argument, however, fails to distinguish between the various claims asserted in the complaint. Assuming, for the sake of argument, that Mr. Tanner is correct that the individual defendants in this case could assert such defenses on the two issues specifically mentioned in the response brief - inadequate care and unlawful confinement - he does not explain how they

8

could also do so on a claim like excessive force. An allegation of inadequate medical care requires a showing of deliberate indifference, a standard that combines both objective and subjective elements. *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001). The Seventh Circuit noted in *Thomas* that, for an official to be liable for violating an inmate's medical needs under the Eighth or Fourteenth Amendments, the defendant must have acted "with a sufficiently culpable state of mind." *Thomas*, 604 F.3d at 301 and n.2 (internal quote and citation omitted).

Mr. Tanner's excessive force claim, however, must be brought under the Fourth Amendment because it arises in the context of an arrest. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). As such, his claim is governed by a standard of "objective reasonableness," which is evaluated "without regard to [the defendant's] underlying intent or motivation." *Chapman*, 241 F.3d at 847 (internal quote and citation omitted). Unlike in *Thomas*, where the defendants could have relied on official practices to show the absence of the requisite intent, it is difficult to see how the officers in this case could point to the City's policies to do likewise when their subjective state of mind does not govern their liability.[1]

---

[1] In fact, courts have questioned the link between official policies and excessive force claims like the one asserted here. *See Medina*, 100 F. Supp.2d at 894 (stating that excessive force cases do not ordinarily involve inquiries into a police department's training and disciplinary procedures).

Morever, Mr. Tanner's other claims, such as retaliation and conspiracy, that involve elements of intent, do not all give rise to the same kind of overlap between possible defenses and *Monell* evidence that was addressed in *Thomas*. That case discussed a defense based on the defendants' inability to act because of conditions created by an official practice. *See Thomas*, 604 F.3d at 305 ("[T]he jury could have found that the [employees] were not *deliberately indifferent* to [plaintiff's] medical needs, but simply could not respond adequately because of the well-documented breakdowns in the County's policies for retrieving medical request forms."). In *Thomas*, therefore, *Monell* evidence could have negated intent by showing that the defendants could not meaningfully choose between two courses of action, thereby making it impossible for the plaintiff to prove the intent requirement of his cause of action.

By contrast, Mr. Tanner alleges that the City's officers undertook very specific actions, but did so in a constitutionally invalid manner. In order to rely on the City's policies to negate intent, as the response brief suggests, the individual defendants would have to argue that, even if they engaged in acts like retaliation and conspiracy, the City's policies either required them to do so or made it impossible for them to act in a different manner. The complaint alleges, for example, that the City has a "code of silence" under which officers fail to report

10

wrongdoing, and that officers can act unconstitutionally because they know the City will not investigate accusations against them. (Compl. at ¶ 52 (c) & (e).) Even if *Monell* evidence could be proffered to support such allegations, the fact that officers could act freely, knowing that the City would overlook their wrongdoing, would not provide a ground for showing that the officers' actions were not intentional; it would only show that the City created an environment in which the officers knew that they would not be held accountable for their actions.

The Court is not persuaded that such explanations accord with what the Seventh Circuit addressed in *Thomas*. Unlike *Thomas*, in which official policies gave rise to injury without individual action, Mr. Tanner's complaint alleges that his harm was caused by policies that were directly carried out on him by individual police officers, a situation suggesting that individual liability is more closely linked to his constitutional violation than was the case in *Thomas*. Not surprisingly, some courts have noted the difference between allegations similar to those in this case and the facts that supported *Thomas*. *See Clarett v. Suroviak*, No. 09 C 6918, 2011 WL 37838, at *2 (N.D. Ill. Jan. 3, 2011) (finding that similar allegations "appear[ ] to depend upon establishing that one of the individual defendants violated Clarett's rights."). In the absence of arguments distinguishing the claims in this case and those in *Thomas*, Mr.

11

Tanner has not shown how the municipal policies and practices at issue here would allow the individual defendants to assert the kind of defense that *Thomas* addresses.

The response brief also fails to demonstrate how the claims asserted here accord with the second *Thomas* factor concerning the theory of municipal liability. The plaintiff in *Thomas* alleged that Cook County was liable for *Monell* damages as a result of the county's customs and policies in operating the county's jail. *Id.* at 302. The complaint in this case combines allegations that the City's liability stems from its policies with claims that Mr. Tanner's constitutional injuries resulted from the City's failure to train its police officers in an adequate manner. (Compl. at ¶¶ 28(a), 34(a), 40(a), 46(a), 52(a), 58(a), & 64(a).) The response brief confirms this dual basis of the *Monell* claims by stating that the individual defendants could rely on the City's policies "and/or" its failure to train them in such a manner that they did not know how to take appropriate action. (Resp. at 5.)

A municipality can be held liable for damages under *Monell* when the need for specialized training is so apparent that the failure to provide it can be attributed to the municipality's deliberate indifference to such a need. *See, e.g., Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989). The Seventh Circuit has been clear since *Thomas* was issued, however, that in a failure-to-train case "a municipality cannot be liable

under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield, Ill.*, — F.3d —, 2010 WL 5128850, at *5 (7th Cir. Dec. 17, 2010) (citing *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[T]here can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights.")). It is not the case, therefore, that all of Mr. Tanner's claims against the City are independent of those asserted against the individual defendants; if his § 1983 claims against the individual defendants fail, his failure-to-train allegations against the City will also fail under *Sallenger*. As a result, this aspect of Mr. Tanner's *Monell* liability theory does not accord with the second of the *Thomas* elements.

As noted above, *Thomas'* interpretation of *Heller* was based on the fact that the individual defendants in that case did not assert any affirmative defenses. Had they done so, the *Monell* claim could have proceeded independently of any finding of individual liability because a jury could have concluded that the officer violated the plaintiff's constitutional rights but was otherwise shielded from liability for such a harm. *Id.* at 604-05. Here, The individual defendants have asserted the affirmative defense of qualified immunity, (Answer at p. 23), thereby raising the concern in *Thomas* that Mr. Tanner could

proceed against the City for *Monell* damages even if the officers are not liable for their alleged § 1983 violations.

Several factors, nevertheless, lead the Court to conclude that the qualified immunity defense does not warrant bifurcation under the facts presented here. Prior to *Thomas*, some courts had already anticipated the effect a qualified immunity defense could have on a plaintiff's *Monell* claim. *See, e.g., Elrod v. City of Chicago*, Nos. 06 C 2505 & 07 C 203, 2007 WL 3241352, at *4 (N.D. Ill. Nov. 1, 2007); *Medina*, 100 F. Supp.2d at 896. Notwithstanding, *Elrod* found that bifurcation was appropriate, in part, because the probability that a defendant would prevail on qualified immunity in an excessive force case is low. *Elrod*, 2007 WL 3241352, at *5; *see also Parker v. Banner*, 479 F. Supp.2d 827, 833 (N.D. Ill. 2007) (granting bifurcation and noting that the facts indicated only a "remote possibility" of prevailing on qualified immunity); *Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *11 n.11 (N.D. Ill. Nov. 29, 2007) (agreeing with *Elrod* on qualified immunity but denying bifurcation on other grounds); *Grant v. City of Chicago*, No. 04 C 2612, 2006 WL 328265, at *3 n.2 (N.D. Ill. Feb. 10, 2006) (stating that the court was "at a loss to imagine how the scenario could occur in this case, where the facts alleged clearly state a claim for excessive force, and the right to be free from excessive force is clearly established."). *Thomas* does not alter this analysis, and

14

the Court agrees with *Elrod* that qualified immunity does not, in itself, necessarily require the bifurcation of *Monell* claims in all cases.

The City takes this argument further by contending that the qualified immunity issue is also distinguishable from the discussion in *Thomas* on other grounds. Unlike in that case, the City has stipulated to pay *Monell* damages if a finder of fact concludes that the individual defendants violated Mr. Tanner's constitutional rights. (Reply at 5; Def's Mot. at Ex. O.) The City points out that many courts in this district have relied on similar liability stipulations as a basis favoring the bifurcation of *Monell* claims from § 1983 claims against individuals. *See, e.g., Nash v. County of Will*, No. 08 C 1170, 2008 WL 4951245, at *2 (N.D. Ill. Nov. 18, 2008); *Elrod*, 2007 WL 3241352, at *4 (collecting cases).

As these and other cases demonstrate, stipulations play an important role in courts' consideration of whether to bifurcate such claims. Some courts have denied bifurcation, in part, on the ground that the municipality did not enter such a liability stipulation. *See Medina*, 100 F. Supp.2d at 897-98. Others have recognized the importance of stipulations but have not ordered bifurcation based on them when, unlike in the case before this Court, the *Monell* claims are so narrowly tailored that no significant discovery burdens arise. *See Wilson v. City of*

*Chicago*, No. 07 C 1682, 2008 WL 4874148, at *2 (N.D. Ill. July 24, 2008) (finding a failure-to-train claim related to the treatment of the mentally ill distinguishable from "generic" *Monell* claims).

Mr. Tanner points out that stipulations do not always succeed in guaranteeing the bifurcation of *Monell* claims. In support, he cites *Bell v. City of Chicago*, No. 09 C 4537, 2010 WL 432310 (N.D. Ill. Feb. 3, 2010), in which the court did not find that a similar stipulation agreeing to pay *Monell* damages was a sufficient reason to bifurcate the *Monell* claims. The court did so on the pragmatic ground that a jury might be confused by being required to enter, on the one hand, a verdict finding in favor of the plaintiff or defendant – which would involve consideration of the qualified immunity defense – and, on the other hand, a separate verdict as to whether the defendant violated the plaintiff's constitutional rights. *Bell*, 2010 WL 432310, at *3.

Other courts, however, have not found that the possibility of such a dual determination precludes bifurcation. In *Almaraz v. Haleas*, 602 F. Supp.2d 920 (N.D. Ill. 2008), a substantially similar stipulation to the City's provided the decisive factor in overcoming that court's traditional reluctance to grant bifurcation. *See Almaraz*, 602 F. Supp.2d at 924 ("Ordinarily, this bench does not bifurcate cases[.]"). As in Bell, the court noted that, if the individual defendants prevailed on qualified

16

immunity, it would be necessary to make a separate finding as to whether they violated the plaintiff's constitutional rights.  Id. at 924.  *Almaraz*, however, did not find this to be a factor weighing against bifurcation, in part, because the court construed the stipulation to mean that a finding on summary judgment would suffice as well as one by a jury.  *Id.; see also Cruz v. City of Chicago*, No. 08 C 2087, 2008 WL 5244616, at *3 (N.D. Ill. Dec. 16, 2008) (adopting *Almaraz*'s interpretation of the summary judgment issue and granting bifurcation).  The same result would also be true in this case, and a jury verdict may not be required to determine whether the individual defendants violated Mr. Tanner's constitutional rights.

In the absence of any argument in the response brief as to why such a result would violate *Thomas*, the Court finds that Mr. Tanner has not demonstrated that he satisfies any of the three *Thomas* elements.  Although the City has been largely silent on these issues, it has chosen to focus on the primary concerns of Rule 42(b), the avoidance of prejudice and the parties' convenience.  *See* Fed. R. Civ. P. 42(b).  As explained more fully below, the Court finds such arguments persuasive under the facts of this case.

### III. *Monell* **Discovery Burdens**

*Monell* discovery "can add significant time, effort, and complications to the discovery process," *Medina*, 100 F. Supp.2d

at 895, and courts have been willing to delay such discovery even when *Monell* issues are not bifurcated from claims against individual defendants. *See Clarett*, 2011 WL 37838, at *3. Accordingly, the City asks the Court to stay discovery on the *Monell* claims because Mr. Tanner has propounded "colossal" discovery requests that will require the production of "tens of thousands" of documents. (Def's Mot. at 2, 7.) That is not the case, Mr. Tanner responds, because the City has already produced all that he requests in *Lolmaugh v. City of Waukegan*, No. 07 C 3782 (N.D. Ill. 2007) and because the City's policies already require it to keep statistics on the information he seeks. (Resp. at 11.)

The record before the Court does not support the claim that the discovery involved in *Lolmaugh* duplicates what Mr. Tanner seeks from the City here. The complaint in *Lolmaugh* shows that it involved substantially similar claims as those asserted here. *See Lolmaugh*, No. 07 C 3782 at Dckt. #1. In fact, the custom and policy allegations in the *Lolmaugh* complaint, which was filed by the same attorney who filed the one here, are identical to Mr. Tanner's. *See id.* The electronic docket for that case, however, shows that the parties settled their dispute at a relatively early stage of the litigation, and the Court has no evidence of what interrogatories or requests for production, if any, were propounded to the City. Mr. Tanner only attaches to his response

brief the City's responses to the plaintiff's requests for admission in *Lolmaugh*, but those requests do not indicate that the City engaged in broad-based discovery as part of its answers. The requests largely involved discrete fact determinations (*e.g.* whether the incident at issue was videotaped) or relatively straightforward admissions, such as whether the City disciplines officers for engaging in excessive force or if the individual police officers involved in that case acted in accordance with the City's policies. (Resp. at Ex. A.)

By contrast, this Court has already reviewed many of Mr. Tanner's *Monell* requests as part of a motion to compel that he brought earlier in this case. With the exception of four requests for admission, that motion involved both interrogatories and requests for production, some of which include the broad discovery demands often associated with *Monell* claims. Mr. Tanner asks, for example, that the City produce all documents related to allegations of police misconduct, as well as documents concerning the investigations and discipline related to such misconduct, from 2003 to the present. (Def's. Mot. at 6.) The Court granted the motion, but that decision was based on the discovery standards of Fed. R. Civ. P. 26, not on a finding that the requests would not be burdensome to the City. *Monell* discovery can be appropriate and even necessary to a plaintiff's claims under Rule 26 and still impose significant burdens on a

municipality under Rule 42(b).[2]

Mr. Tanner's reliance on the City's General Order 52.1.11 to argue that the City has already carried out the discovery he seeks is also misplaced. General Order 52.1 provides that the police department's Office of Professional Standards is required to conduct investigations into complaints filed against the department's personnel. (Resp., Ex. B at D0294.) Section 52.1.11 states: "The [Police] Department will maintain annual statistics on personnel and dispositions. The statistical summary shall be made available through the Office of Professional Standards for public inspection and review." (*Id.* at D0299.)

Contrary to Mr. Tanner's suggestion, General Order 52.1.11 does not explicitly require the City to retain records of its investigations or to preserve documents that may be generated as part of investigations against police officers. On its face, Order 52.1.11 only mandates that the City keep "annual statistics" on "personnel and disposition" – language that does not clearly indicate that the City maintains anything more than a list of complaints, the persons against whom they were made, and the result of official investigations. The response brief claims

---

[2] Mr. Tanner alleges that the City's motivation for bringing the instant motion to bifurcate is suspect because it was filed on the heels of the Court's discovery order. The City openly states, however, that avoiding the potential burdens of *Monell* discovery is its primary goal, (Def's. Mot. at 3), and Rule 42(b) explicitly provides that bifurcation is appropriate "[f]or convenience . . . or to expedite and economize[.]" Fed. R. Civ. P. 42(b).

that "the City already compiles the information that Plaintiff requests." (Resp. at 11.) If that were the case, however, it is difficult to understand why the earlier motion to compel *Monell* discovery would have been necessary. Order 52.1.11 makes the annual statistics available for public review, and if this information were equivalent to the *Monell* evidence sought, the motion to compel would have been superfluous. Moreover, the *Monell* requests submitted as part of the motion to compel plainly include far more than Order 52.1.11 addresses.[3]

The Court's familiarity with the *Monell* requests that have already been propounded distinguishes this case from those in which it is not clear how much discovery will be avoided, or at least deferred, by bifurcating *Monell* claims. *See, e.g., Medina*, 100 F. Supp.2d at 897 ("At this point, discovery has just begun. The court believes that it is far too early to determine that the trial should be bifurcated."). As one court has observed, moreover, staying *Monell* discovery while discovery proceeds against individual defendants can also have the beneficial effect of placing the parties "in a position to resolve the case through

---

[3] The City contends that Mr. Tanner will also wish to take the depositions of Rule 30(b)(6) witnesses, including high-ranking administrators, members of the Waukegan police department, and perhaps City Council members - none of whom will be deposed if the § 1983 claims against the individual defendants are bifurcated. (Resp. at 8.) Mr. Tanner has not attempted to deny or rebut the City's argument on this issue, apparently conceding the issue altogether. Thus, the Court cannot say at this point that the City's argument is entirely speculative.

21

settlement or summary judgment motions." *Clarett*, 2011 WL 37838, at *3.

Accordingly, the Court finds that the burdens of discovery on the *Monell* claims brought by Mr. Tanner in this case weigh in favor of the City's motion to bifurcate and stay discovery.

**IV. Prejudice to the Parties**

The City contends that failing to bifurcate the *Monell* issues would seriously prejudice the individual defendants. If all the claims go to trial simultaneously, the City argues, evidence relating to the City's policies, as well as evidence concerning other non-party officers who may have engaged in acts similar to those alleged here, could overwhelm the evidence Mr. Tanner is able to proffer on his claims against the individual defendants. (Def's. Mot. at 8-9.) In addition, the City claims that Mr. Tanner will not be prejudiced by separate trials because it has already agreed to compensate him for any § 1983 damages awarded for acts related to the officers. For his own part, Mr. Tanner claims that he will be prejudiced by bifurcation because the City's stipulation discussed earlier creates a "liability gap" that could leave him uncompensated for his *Monell* claims. (Resp. at 6.)

The City's argument that prejudice could result by trying all the claims at a single trial is a familiar one in *Monell* cases, with some courts finding that the potential for prejudice

supports bifurcation and others finding that it does not. *Compare Ojeda-Beltran v. Lucio*, No. 07 C 6667, 2008 WL 2782815, at *3 (N.D. Ill. July 16, 2008) (relying, in part, on prejudice to grant bifurcation under similar facts) *with Medina*, 100 F. Supp.2d at 897 (declining to find prejudice in an excessive force and failure-to-train case). As *Medina* states – and as Mr. Tanner contends – courts justifiably rely on jury instructions to protect against the possibility that evidence relating to one defendant will affect a jury's consideration of another defendant's liability. *Medina*, 100 F. Supp.2d at 897; *see also Elrod*, 2007 WL 3241352, at *7 ("Generally, the issue of avoiding prejudice at trial is better addressed by application of the Rules of Evidence, rulings in limine, and limiting instruction.").

In this case, however, the City's prejudice argument does have merit. A number of courts that have declined to find prejudice have done so, at least in part, because discovery had not yet shown what other evidence might be introduced at trial. *See Medina*, 100 F. Supp.2d at 897 ("[A]t this point neither the parties nor the Court has the least idea what evidence actually would be offered at trial on the *Monell* claim or just how prejudicial that evidence might actually be to the officers."); *Cadiz*, 2007 WL 4293976, at *6 (noting that the court could not determine the extent of prejudice because "*Monell* discovery has

not yet been fully produced").

The parties do not contend that the City has already produced its *Monell* evidence in this case, but the Court is thoroughly familiar with what that production involves based on the earlier motion to compel. Without determining the admissibility of evidence responsive to those requests, the Court notes that Mr. Tanner seeks misconduct and disciplinary evidence concerning non-party police officers over a seven-year period, as well as state and federal jury verdicts against officers over a ten-year span. If admitted as part of his case against the City, such evidence could prejudice the individual defendants' ability to distinguish their own actions from those of other non-party officers. Mr. Tanner's reliance on limiting instructions is well placed as a general principle, but the extent of the *Monell* evidence he is seeking here weighs in favor of finding that some prejudice could arise under these facts. *See Jones v. City of Chicago*, No. 98 C 5418, 1999 WL 160228, at *3 (N.D. Ill. March 10, 1999) (finding that interrogatories seeking similar evidence over a twelve-year period justified bifurcation).

On the other hand, Mr. Tanner's argument concerning a "liability gap" stemming from the stipulation fails to account for the language of that agreement. (Resp. at 6-7.) Relying on his earlier *Thomas* argument, Mr. Tanner contends that he could prevail on his policy claims against the City even if the

24

individual defendants are not liable to him, and that the stipulation would remove this possibility of additional damages. This argument assumes that the stipulation precludes *Monell* damages even if, as Mr. Tanner contends, he is able to proceed against the City without a finding of individual liability. *See* Response at p.6 ("Based on the terms of the City's proferred 'certification,' the City will be held liable only in the event that Plaintiff obtains a judgment against one or more of the named Defendant Officers."). Such an interpretation misconstrues what the City's agreement actually states. The stipulation does not extinguish Mr. Tanner's *Monell* claims if he fails to show individual liability; it only requires the City to pay *Monell* damages if he succeeds on the individual claims in order to save the burdens of discovery and trial. Indeed, no municipality could stipulate its way out of *Monell* damages in the way Mr. Tanner assumes.

Nor does bifurcation prevent Mr. Tanner from asserting his claims against the City if, as he alleges, he is able to bring those claims independently of the § 1983 claims against the individuals. Bifurcating claims is not the same as dismissing them, and if Mr. Tanner were able to proceed against the City on a claim that failed against an individual defendant, as he states he could, he would not be precluded from obtaining *Monell* damages

on that issue as a result of the stipulation agreement.[4]

As an extension of the prejudice argument, Mr. Tanner also contends that denying bifurcation would serve the larger public interest by deterring future wrongdoing by the City. (Resp. at 8.) Citing *Owen v. City of Independence, Mo.*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), he points out that the Supreme Court has held that § 1983 "was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations" by a municipality. *Owen*, 445 U.S. 651, 100 S.Ct. at 1416. Reliance on *Owen* is misplaced in this context, however, because that case addressed whether qualified immunity could shield a municipality against § 1983 liability. Here, the City does not contend that it should never be liable for *Monell* damages, only that the determination for such liability should proceed, if at all, after the claims against the individual defendants are complete.

As Mr. Tanner notes, some courts have found that proceeding against a municipality can provide non-economic deterrents against future violations. *See, e.g.*, *Medina*, 100 F. Supp.2d at

---

[4] The City is also statutorily obligated to the indemnify the individual defendants for any judgment against them resulting from acts performed within the scope of their job duties. 745 ILCS 10/9-102. Some courts have not found such an obligation to be a basis for bifurcation because a municipality could dispute its obligation to pay. *See Medina*, 100 F. Supp.2d at 896. In this case, however, the City concedes that the individual defendants were acting within the cope of their employment, (Def's. Mot. at 10), and any concern that the City might dispute payment under 9-102 appears to be minimal.

896.  Other courts have reached different conclusions.  *See,*
*e.g., Almaraz,* 602 F. Supp.2d at 925 ("That a liability finding
against the City specifically based on *Monell* would be a greater
deterrent than a judgment of liability based on the stipulation
is a questionable assumption.").  Here, however, Mr. Tanner does
not address why non-economic factors would provide any more
deterrence than would damages alone.  In the absence of any
argument by Mr. Tanner on why the stipulation itself is
insufficient, the Court does not find that he has shown that
bifurcation should be denied under these facts in order to deter
future unconstitutional action by the City.

For these reasons, the Court finds that bifurcating the
*Monell* claims poses no prejudice to Mr. Tanner but that failing
to bifurcate them could prejudice the individual defendants at
trial.

## Conclusion

For the reasons explained above, the City's Motion to
Bifurcate Section 1983 Claims and to Stay Discovery and Trial on
Those Claims is granted.  Discovery and trial on Mr. Tanner's
*Monell* claims are stayed until his remaining claims in this case
have been resolved.

Date:    February 16, 2011       ENTER:

Arlander Keys
_____
ARLANDER KEYS
United States Magistrate Judge